# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3390-18T4

DEBRA A. MANDELBAUM,

    Plaintiff-Respondent,

v.

MICHAEL J. MANDELBAUM,

    Defendant-Appellant.

_____

Argued January 23, 2020 – Decided August 6, 2020

Before Judges Nugent, Suter and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0644-14.

Mark W. Rufolo argued the cause for appellant (Stern Kilcullen & Rufolo, LLC, and Donahue Hagan Klein & Weisberg, LLC, attorneys for appellant; Mark W. Rufolo and Stephanie Frangos Hagan, of counsel and on the briefs; Kaitlyn A. Lapi, on the briefs).

Brian G. Paul argued the cause for respondent (Szaferman Lakind Blumstein & Blader, PC, attorneys; Brian G. Paul, on the brief).

PER CURIAM

Defendant Michael J. Mandelbaum appeals from a judgment of divorce, amended final judgment of divorce, and certain paragraphs of an order entered the same day as the amended final judgment of divorce. The question presented by this appeal is whether the parties were lawfully married. Their Jewish marriage certificate, the Ketubah, was duly signed by the friends who witnessed the ceremony and the Rabbi who performed it. The Certificate of Marriage was signed by two witnesses, by the Rabbi who performed the ceremony, and by local registrar, and is a filed public record in the New Jersey State Department of Health. For more than twenty years, defendant and plaintiff Debora A. Mandelbaum held themselves out to their friends and society as a married couple. They have filed tax returns as a married couple filing jointly, and they have owned property as tenants by the entireties.

In 2014, however, when plaintiff filed a complaint for divorce, defendant moved to dismiss it on the ground they had never been legally married. He contended, among other claims, the Rabbi who presided over the religious ceremony provided false information on the parties' Certificate of Marriage, the parties did not have a marriage license for the religious ceremony, and the marriage was absolutely void from its inception. Following a hearing, the trial

2

court rejected defendant's claims and entered a judgment of divorce, which the court amended. We affirm.

The trial court conducted a hearing to determine the validity of the marriage. The chronology of material events is undisputed. The parties had neither applied for nor obtained a marriage license when Rabbi Arnold Gluck performed a religious wedding ceremony on December 5, 1993. Plaintiff, defendant, two witnesses, and the Rabbi signed a Ketubah, which Rabbi Gluck explained was a Jewish marriage certificate, "one of the three ways according to Jewish law that a couple becomes married." Rabbi Gluck admitted that by performing a ceremony without executing a civil license, he was "coloring outside the lines." He explained to the parties that it was inappropriate in the context of the "civil aspect" to complete the ceremony without a marriage license, and he instructed them to obtain one.

On December 10, 1993, five days after the ceremony, the parties met with the Bedminster Township clerk to obtain the marriage license. They designated the "Intended Date of Marriage" as December 5, 1993. Noting the inconsistency, the clerk told them there was a problem with the application, it was improper to have a ceremony without a marriage license, and that a second ceremony would be necessary.

Inexplicably, the clerk nonetheless issued the marriage license with the December 5, 1993 wedding date. She issued the license on December 21, 1993. It expired January 21, 1994.

Three months after issuing the license and two months after it expired, the clerk contacted the parties on March 21, 1994, regarding the status of the license because it had not been recorded. Acting on defendant's instructions, the clerk sent the license to Rabbi Gluck.

Within the next few days, defendant met with Rabbi Gluck and the witnesses who had signed the Ketubah. They signed the marriage certificate. Rabbi Gluck misstated as December 12, 1993, the date the religious ceremony had taken place—thus representing the ceremony had occurred one week after its actual date and nine days before the clerk issued the marriage license on December 21, 1993.

The Rabbi wrote to the municipal clerk on March 28, 1994, asked what had become of the marriage license, and noted perhaps she expected that someone would pick it up. He also wrote: "Most importantly, I hope that there will not be any difficulty in processing the license at this time. The wedding took place on Dec. 12 in Hillsborough, NJ at Temple Beth-El. I

4

officiated in accordance with Jewish tradition, and all is proper and in order in this regard."

On April 5, 1994, the municipal clerk forwarded the completed Certificate of Marriage and marriage license to the local registrar of vital statistics. The local registrar received, signed and recorded the completed Certificate of Marriage and marriage license on April 8, 1994. The certificate has been on file since then. It states the parties were ceremoniously married before the license was issued.

Although the parties do not dispute either the chronology of events or the documentary evidence produced during the hearing, they dispute the significance they attached to the documents. Based on portions of plaintiff's deposition admitted into evidence at the hearing, plaintiff claimed she believed the parties were legally married after receiving the Certificate of Marriage from the State in April 1994. Plaintiff stated: "I had a ceremony, I received legal documentation from the State of New Jersey. To me there was no need to repeat what the [S]tate already recognized, that I was legally married."

According to defendant's testimony at the hearing, plaintiff knew there was a problem with the marriage. He testified that when they went to the municipal clerk's office to obtain a marriage license, the clerk specifically told

them they would need to repeat the ceremony. Defendant insisted the Bedminster Township clerk expressly told plaintiff she must have another ceremony. Defendant also claimed that periodically he suggested to plaintiff they renew their vows or take other measures that he thought would resolve any question about the legality of their marriage. Plaintiff would not hear of it.

Unlike plaintiff, defendant was aware at the outset there was a problem with the marriage. He testified he was concerned through 1997 or 1998, when he "forgot about the issue with the paperwork."

As previously noted, during the marriage the parties filed joint tax returns. They held themselves out as husband and wife, joined a country club as husband and wife, filled out as husband and wife private school applications for their children, and obtained automobile insurance in their joint names as spouses. Defendant designated plaintiff as his spouse on his health insurance policy. Defendant also acknowledged the parties purchased real estate as joint tenants by the entirety.

The trial court resolved the credibility issues in plaintiff's favor. The court found plaintiff believed the parties' marriage was valid from its inception. Conversely, the court rejected defendant's argument that four or five years after the marriage he forgot about the issue with the paperwork. The trial court found

6

the parties' marriage was legally valid, determining, among other conclusions, the equitable doctrines of quasi-estoppel and laches precluded defendant from challenging its validity.

On appeal, defendant raises the following points:

POINT I: THE TRIAL COURT COMMITTED ERROR WHEN IT CONCLUDED THE PARTIES WERE LAWFULLY MARRIED AND ISSUED A JUDGMENT OF DIVORCE, IN VIOLATION OF THE PLAIN LANGUAGE OF N.J.S.A. 37:1-2 AND N.J.S.A. 37:1-10, WHICH RENDER UNLAWFUL AND ABSOLUTELY VOID AB INITIO ANY PURPORTED MARRIAGE CONDUCTED WITHOUT FIRST OBTAINING A MARRIAGE LICENSE.

1. The Purported Marriage Was Unlawful Because The Parties Failed To First Obtain A Marriage License And Present It To The Officiant, In Violation Of N.J.S.A. 37:1-2.

2. The Purported Marriage Was Absolutely Void Because The Parties Failed To Comply With The Two-Step Process Of First Obtaining A Marriage License And Then Participating In A Solemnization Ceremony Performed By An Authorized Person, In Violation Of N.J.S.A. 37:1-10.

3. The Trial Court Erroneously Found That The Parties Purported Marriage Was Not Valid Based Upon The

7

Incorrect Determination That Although The State Requires Both A License And A Solemnization, It Does Not State That Taking Them In The Wrong Order Renders The Marriage Absolutely Void.

POINT II: THE DOCTRINES OF QUASI-ESTOPPEL AND RATIFICATION ARE INAPPLICABLE AS ANY PURPORTED MARRIAGE WAS VOID AB INITIO.

We affirm, substantially for the reasons expressed by the trial court in its oral and written opinions. We add the following comments.

N.J.S.A. 37:1-10, effective July 18, 1939, states in pertinent part:

> [N]o marriage contracted on and after December first, nineteen hundred and thirty-nine, shall be valid unless the contracting parties shall have obtained a marriage license as required by section 37:1-2 of this Title, and unless, also, the marriage, after license duly issued therefor, shall have been performed by or before any person, religious society, institution or organization authorized by section 37:1-13 of this Title to solemnize marriages; and failure in any case to comply with both prerequisites aforesaid, which shall always be construed as mandatory and not merely directory, shall render the purported marriage absolutely void.

We have previously noted the statute's purpose:

> As appears from the statement attached to the bill (Assembly No. 10) which was enacted as chapter 227 of the Laws of 1939, "the purposes of this bill [were] two-fold." First, it would insure that there would be no evasion of the then recently enacted statute (L. 1938, c.

8

126; N.J.S.A. 37:1-20, et seq.) requiring blood tests of persons intending to marry and the filing with the application for a marriage license of a certificate showing that the applicants are not infected with syphilis. Second, it would eliminate "the many abuses arising from common law marriages and the countless claims of marital relations under this loose form of matrimony" and make "possible the maintenance of proper records, desirable from the State's standpoint as well as from either spouse's."

[In re Estate of Silverman, 94 N.J. Super. 189, 193-94 (App. Div. 1967).]

Here, these objectives were achieved. First, defendant acknowledged during his testimony he and plaintiff both got blood tests because the marriage license would not have issued without the blood tests. He added: "I was happy to learn I didn't have [s]yphilis which is the reason for the blood test." Next, their obtaining a marriage license avoided for the entire duration of their marriage "the many abuses arising from common law marriages and the countless claims of marital relations under this loose form of matrimony[.]" Estate of Silverman, 94 N.J. Super. at 194. Last, the filed marriage certificate made "possible the maintenance of proper records, desirable from the State's standpoint as well as from either spouse's." Ibid. We also note the statute's two mandates—the obtaining of a marriage license and a ceremony performed by an

authorized official—were satisfied, albeit not in the order required by the statute.

The doctrine of "[q]uasi-estoppel" dictates "an individual is not permitted to 'blow both hot and cold,' taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person has actually relied thereon." Heuer v. Heuer, 152 N.J. 226, 237 (1998) (quoting Kazin v. Kazin, 81 N.J. 85, 94 (1979)). The doctrine is "designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to the demands of justice and good conscience." Ibid. (quoting Carlsen v. Masters, Mates, & Pilots Pension Plan Tr., 80 N.J. 334, 339 (1979)).

Here, permitting defendant to disavow his twenty-year marriage would hardly be responsive to the demands of justice. Rather, permitting the result defendant seeks would undermine one of the two purposes of the marriage statute and would be tantamount to countenancing two decades of fraud perpetrated on plaintiff, the federal government, the state government, and others. We conclude the trial court correctly applied the doctrine of quasi-estoppel to avert such injustices.

We have considered defendant's remaining arguments and found them to be without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3390-18T4